**Frederick N. LEVINGER, Plaintiff,**

v.

**MATTHEW STUART & CO., INC. and Robert Pfeffer, Defendants.**

Civ. A. No. 87–0362 L.

United States District Court,
D. Rhode Island.

Jan. 7, 1988.

Vetter & White, Providence, R.I., for plaintiff.

Joseph V. Cavanagh, Jr., Michael DiBiase, Blish & Cavanagh, Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter concerns two issues raised by motion of defendants in response to plaintiff's complaint. The first is whether the Court should dismiss the complaint for lack of jurisdiction over the person pursuant to Fed.R.Civ.P. 12(b)(2). The second is whether the Court should transfer the case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). For the following reasons the Court denies both of defendants' motions.

Plaintiff Frederick N. Levinger is a citizen of the State of Rhode Island. He is President of Park Lane Associates, Inc. (Park Lane) and former sole stockholder of that corporation. Park Lane is a Delaware corporation with its principal place of business in Providence, Rhode Island.

Defendant Robert Pfeffer is a citizen of the State of New York. He is President of defendant, Matthew Stuart & Co. (MSC), a New York corporation with its principal place of business in New Rochelle, New York.

Levinger first met defendant Pfeffer in the Fall of 1984 when he was visiting his brother-in-law Richard Perlman at the office of Schulte, Roth & Zabel in New York City. At this meeting the two men discussed whether Park Lane would be interested in retaining MSC as an agent for the purpose of finding prospective purchasers for the assets of Park Lane.

In October of 1984, Pfeffer mailed a broker's agreement to Levinger in Rhode Island "confirming" the results of the prior discussions. Levinger, however, never executed this "agreement." Instead, he had counsel in Rhode Island, Adler, Pollock & Sheehan, Inc., draft a more detailed agency contract. It provided that MSC, for an agreed upon fee, would be retained as a "non-exclusive agent" for Park Lane to assist the latter company in finding a purchaser for its Colibri Division. The agreement also provided that its "validity and interpretation" would be governed by the laws of the State of Rhode Island. The contract was mailed to Pfeffer who executed it on behalf of MSC and returned it to Levinger in Rhode Island.

MSC arranged several introductions over the next nine months; however, these were unsuccessful. In the Fall of 1985, Levinger decided that Park Lane was no longer interested in having MSC seek candidates to acquire the assets of the Colibri Division. Instead, he desired MSC to find candidates for acquisition by Park Lane. In December of 1985, Levinger confirmed this change of strategy in writing; Pfeffer allegedly acknowledged this request.

On January 15, 1986, Levinger wrote Pfeffer indicating that Levinger would be retaining MSC at the rate of $2000 per month to pursue this new strategy (finding potential acquisitions for Park Lane). Between approximately December 1985 and February 1986, Park Lane allegedly made several $2000 per month payments to MSC in accordance with the parties' "modification" of the November 1984 agreement.

In February of 1986, Pfeffer arranged an introductory luncheon between Park Lane and the ARTRA Group, Inc. (ARTRA) in New York City. After extensive negoti-

ations the Lori Corporation (Lori), a 70.4% owned subsidiary of ARTRA, agreed to purchase all the issued and outstanding capital stock of Park Lane.

After the sale of the Park Lane stock was consummated, MSC sent Levinger an invoice for payment of $500,000 worth of services. Levinger refused to pay claiming that MSC was barred from a commission by a July 1985 agreement between ARTRA and MSC in which MSC promised that it would "not be a party to a double fee." In addition, the December 1986 Stock Purchase Agreement allegedly contains language to the effect that Lori would assume the sole responsibility for MSC's finder's fee. MSC contends, however, that its invoice for services rendered was based upon promises made by Levinger apart from these two documents.

In March of 1987, Stephen Forman, a partner at Arthur Young & Company (Arthur Young) in Providence, who had advised Park Lane as to the tax consequences of the Park Lane—Lori transaction, received a phone call from Pfeffer. Forman claims that Pfeffer threatened to cause Levinger problems with the Internal Revenue Service unless Levinger paid Pfeffer his commission.

The entire matter concerning Pfeffer's commission was turned over to counsel for both parties. Negotiations proceeded throughout the middle of 1987, until Levinger filed suit in this Court in July of this year. In response to plaintiff's complaint, defendants moved to dismiss the case for lack of jurisdiction over the person pursuant to Fed.R.Civ.P. 12(b)(2). In the alternative, defendant moved to transfer the case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). Oral argument was heard regarding these motions on October 28, 1987. The matter was taken under advisement. After carefully scrutinizing the memoranda and supporting materials presented by the parties, the Court is prepared to render a decision on the matter.

■ Whether a federal court has personal jurisdiction over a defendant depends upon two criteria: (1) whether the mandates of the forum state's long-arm statute have been satisfied, and (2) whether the defendant has been hailed into the particular court in accordance with the due process clause of the Fourteenth Amendment to the United States Constitution. Since the Supreme Court of Rhode Island has held that Rhode Island's long-arm statute reaches to the full breadth of the Fourteenth Amendment, *Conn v. ITT Aetna Finance Co.*, 105 R.I. 397, 402, 252 A.2d 184, 186 (1969), one need only examine the foundation for the second criterion listed above.

One way a plaintiff may hail an out-of-state defendant into a Rhode Island federal court within the strictures of the due process clause is to satisfy the following three-part test.

(1) Plaintiff's claim must arise out of or be directly related to defendants' contacts with the forum state.

(2) Defendants' conduct must have been purposefully directed towards the forum state.

(3) Assertion of jurisdiction by the Court must be "reasonable" under the circumstances.

*Asahi Metal Ind. v. Superior Court,* —— U.S. ——, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984). The applicability of the third part of this test has not been, and for that matter, cannot be seriously contested by defendants. It remains, therefore, for the Court to determine whether the first and the second parts of the test have been satisfied in the present case.

Count II of plaintiff's complaint alleges that MSC and Pfeffer owed Levinger "a continuing fiduciary duty of loyalty," which was breached by MSC's and Pfeffer's "wrongful demands for double payment and unlawful conduct." If this allegation is regarded as having some foundation in fact then there can be little question that it is directly related to or arises out of defendants' contact with the forum state, Rhode Island.

Plaintiff alleges a breach of fiduciary duty. This breach is premised on the alleged "sham invoice" which defendants sent to plaintiff in Rhode Island from New York. It is also premised on the alleged "veiled threat" which defendant made to Stephen Forman of Arthur Young in Providence, Rhode Island.

These two contacts with Rhode Island, however, are not all there is to this case. Defendants had further significant contact with the state of Rhode Island—contact which created the duty that plaintiff alleges was breached in this case. Plaintiff claims he had Rhode Island counsel draft a contract and send it to Pfeffer in New York for execution. The contract provided that MSC would act as a "nonexclusive agent" for Park Lane in exchange for a fee. Defendant Pfeffer purportedly signed this agreement on behalf of MSC and returned it to Rhode Island for plaintiff's signature. But for the fact defendants entered into a business relationship with a Rhode Island corporation, no claim for breach of that relationship could have been lodged by plaintiff against the defendants. Plaintiff's claim, then, "arises out" of or is "directly related" to defendants' contact with the forum state.

The question remains, however, whether defendants' conduct was "purposefully directed" towards Rhode Island. In deciding this question in the context of a contract case, the Supreme Court has directed lower federal courts to examine three considerations.

(1) The parties' prior negotiations and contemplated future consequences.

(2) The terms of the contract itself.

(3) The parties' actual course of dealing. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479, 105 S.Ct. 2174, 2186, 85 L.Ed.2d 528 (1985).

The second consideration may be disposed of quickly. The contract at issue expressly states that "the validity and interpretation of this agreement shall be governed by the laws of the State of Rhode Island." When defendant Pfeffer signed the November agreement, he consented for himself and MSC that Rhode Island law would govern adjudication of claims arising from breach of the November agreement. That defendants consented to such a choice of law is at least some indication that they purposefully availed themselves of benefits from the forum state. *Burger King,* 471 U.S. at 482, 105 S.Ct. at 2187.

The parties actual course of dealing supports the same finding. Defendants MSC (through its President Pfeffer) and Pfeffer himself dealt directly with Levinger when the agency relationship was allegedly established between Park Lane and MSC. Clearly defendants were not deceived or coerced into transacting business with a Rhode Island corporation. *See Burger King,* 471 U.S. at 484, 105 S.Ct. at 2188. They did so voluntarily.

Moreover, in order to execute performance pursuant to the November agreement, Pfeffer visited Rhode Island to review Park Lane's facilities and financial statements. After this visit, Pfeffer unsuccessfully sought out purchasers for Park Lane's Colibri Division. According to Levinger's affidavit, once these deals fell through, the original agreement between the parties (via correspondence and telephone calls) was "modified." Pfeffer was now to find candidates for acquisition by Park Lane in exchange for a $2000 monthly payment. Several of these payments were allegedly made to Pfeffer in New York City.

After the sale of Park Lane stock to Lori had been completed, Pfeffer sent Levinger an invoice requesting payment for an allegedly extortionate amount of money. In addition, Pfeffer purportedly called up Levinger's tax accountant, Stephen Forman in Rhode Island, and threatened to cause Levinger problems with the Internal Revenue Service if Levinger did not pay his bill. Whether these alleged actions on the part of Pfeffer create a cause of action is immaterial to the issue at hand. The fact is Pfeffer created a business relationship with a Rhode Island corporation and its chief executive officer in which he expected payment for his services. This is indicative that defendants' conduct was purposefully directed at Rhode Island.

Finally, the first consideration supports this conclusion. The negotiations which culminated in the November 1984 agreement commenced in the Fall when Levinger visited his brother-in-law, Richard Perlman, in New York City. Perlman introduced Levinger to Pfeffer and the latter two commenced discussion regarding the retention of MSC as a "non-exclusive agent" for Park Lane. In October of the same year, Pfeffer mailed Levinger a "broker's agreement." Levinger, however, insists that he never executed this agreement. Instead, Levinger requested his former counsel Adler, Pollock & Sheehan, Inc. to draft a contract which would provide for the retention of MSC. Levinger claims that this contract was mailed to Pfeffer, "who executed it on behalf of MSC" and returned it to Levinger in Rhode Island.

■ These prior negotiations again reveal the development of an involved business relationship between Levinger and Park Lane on the one hand, and MSC and Pfeffer on the other. It was a relationship which in its simplest form contemplated a promise by MSC to find parties who would be interested in acquiring the assets of the Colibri Division in exchange for an agreed upon fee. In entering into this relationship, defendants were going to reap a substantial monetary benefit from a Rhode Island business. The parties' prior negotiations and their contemplated future consequences, like the second and third considerations, thus, indicate that defendants purposefully directed their conduct towards the forum state. Having reached this conclusion, the Court is required to hold that its assertion of personal jurisdiction over defendants does not violate the due process clause of the Fourteenth Amendment. Plaintiff's motion to dismiss for lack of jurisdiction over the person, is therefore, denied.

■ If the case cannot be dismissed for lack of personal jurisdiction, defendants argue in the alternative that it be transferred to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). To obtain the result they seek, defendants must make a strong showing that transfer of venue is appropriate under the circumstances. *Leesona Corp. v. Duplan Corp.*, 317 F.Supp. 290, 299 (D.R.I.1970). The Court believes defendants have not sustained this burden and their motion to transfer is, therefore, denied.

28 U.S.C. § 1404(a) sets out three factors which are to guide a district court in determining whether a motion to transfer venue should be granted. They are:

(1) The convenience of the parties.

(2) The convenience of the witnesses.

(3) The interests of justice.

The first factor weighs neither for nor against transferring this case to the Southern District of New York. Levinger and his business are located in Rhode Island; Pfeffer and his business are located in New York. To tear either party away from their enterprises for trial, would no doubt, as the parties claim, cause them some inconvenience and expense.

The potential witnesses for Levinger and Pfeffer are in the same position as the parties themselves. The lawyers from Adler, Pollock & Sheehan, Inc. who drafted the agreement in dispute would have to travel to New York to testify if a transfer were granted. Similarly, potential witnesses of Pfeffer, such as Vivienne W. Nearing, would have to travel to Rhode Island if the Court does not transfer the case to the Southern District of New York. No matter what the outcome of defendants' motion to transfer, either side's potential witnesses will be inconvenienced in some way.

As to the third factor, plaintiff contends that it is in the "interest of justice" to transfer this case to the Southern District of New York because it is a strike suit, brought solely to deprive defendants of their choice of forum. Were the complaint construed solely as one for declaratory relief, this might be the case; however, the first three counts of the complaint seek damages; and, as has already been shown, the second count is directly related to or arises from defendants' conduct in Rhode Island. It would manifestly not be in the interest of justice to transfer the case, and thus deprive Levinger of litigating a poten-

tially valid cause of action in the forum of his choice. The last factor, then, if anything, weighs against transferring the case to the Southern District of New York.

Under § 1404(a), defendants have failed to make a strong showing that either the convenience of the parties, the convenience of the witnesses, or in the interest of justice, a transfer should be granted. Their motion to transfer the case is, therefore, denied.

For all the above reasons defendants' motion to dismiss the case for lack of jurisdiction over the person pursuant to Fed.R. Civ.P. 12(b)(2) is denied. Defendants' alternative motion to transfer the case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a) is also denied.

*It is so Ordered.*