Stephen M. BARRY, on behalf of himself and all others similarly situated

v.

MORTGAGE SERVICING ACQUISITION CORPORATION, doing business as National Mortgage Company, Texas Bank of Commerce and B First Residential Corporation.

Civ.A.No. 94–0470ML.

United States District Court, D. Rhode Island.

Nov. 28, 1995.

---

Boyajian, Harrington & Richardson, Alden C. Harrington, Providence, RI, for Plaintiff.

Partridge, Snow & Hahn, Steven E. Snow, Providence, RI, for Defendants.

## ORDER

LISI, District Judge.

The Findings and Recommendation of United States Magistrate Judge Robert W. Lovegreen filed on **July 14, 1995** in the above-captioned matter is accepted pursuant to Title 28 United States Code § 636(b)(1).

## REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

Before me is defendant's, Texas Bank of Commerce ("TBC"), motion to dismiss for lack of *in personam* jurisdiction and failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(2) and (6) respectively. Plaintiff, Stephen M. Barry ("Barry") brought this suit seeking to maintain it as a class action and making claims alleging the defendants violated the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and various state consumer protection laws and for restitution. The class has yet to be certified.

This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule of Court 32(c). For the following reasons, I recommend defendant's motion to dismiss pursuant to Fed.

R.Civ.P. 12(b)(2) be granted, as this Court lacks *in personam* jurisdiction over Texas Bank of Commerce. Consequently, I recommend that the defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) be denied without prejudice to being raised again, as it is moot under the circumstances.

### Facts

On December 22, 1993, Barry, a resident of Massachusetts, entered into a mortgage agreement with B First Residential Corporation ("B First"), a Rhode Island corporation, for the refinancing of his Massachusetts residence. The mortgage was closed in Massachusetts. In conjunction with this transaction, B First issued Barry a Truth in Lending Act ("TILA") disclosure statement and a HUD–1 settlement statement. Barry alleges that the TILA disclosure statement improperly excluded from the "finance charge" and included in the "amount financed" a $45 courier fee for transportation of documents in violation of TILA, 15 U.S.C. § 1601 et seq., and various state consumer protection laws. Barry claims that TBC, a national banking association organized and headquartered in Texas, is liable for these violations as an assignee of his mortgage loan. The nature of TBC's status is not entirely clear, but the bank was involved at some level in a number of highly complex mortgage purchase agreements with a number of other entities.

On March 9, 1993, B First entered into an agreement with Kidder Peabody Mortgage Capital Corporation ("KPMCC") to which TBC was not a party and under which KPMCC agreed to purchase mortgages originated by B First on an on-going basis and then sell the assembled mortgages back to B First or its designee at a specified premium (the "KPMCC Repo Transaction No. 1"). TBC then entered into a separate custodial agreement (the "KPMCC Custodial Agreement") with B First and KPMCC under which TBC agreed to have the mortgages covered by the KPMCC Repo Transaction No. 1 assigned to it as "custodian or trustee". The mortgage loan made to Barry on December 22, 1993 was among the mortgages assigned to TBC in connection with KPMCC Repo Transaction No. 1.

The KPMCC Custodial Agreement required TBC to take custody of certain specified mortgage documents, not including the TILA disclosure and HUD–1 statements, at its Houston, Texas headquarters. It also required TBC to take legal title to the mortgage loans for the benefit of KPMCC as an agent and bailee and custodian of KPMCC. One of the purposes of TBC taking such legal title was to perfect a security interest in the mortgage loans for KPMCC to the extent B First was deemed to have pledged the mortgage loans in connection with the repurchase agreement.

On March 10, 1994, KPMCC sold certain of the mortgage loans purchased from B First, including the Barry loan, back to B First which, on the same day, sold certain mortgage loans, including Barry's, to CC Mortgage Company, L.P. ("CC Mortgage"). Pursuant to an agreement dated March 1, 1994, among KPMCC Mortgage Servicing Acquisition Corporation d/b/a National Mortgage Corporation ("National") and CC Mortgage, to which TBC was not a party, KPMCC agreed to purchase mortgages owned by CC Mortgage on an ongoing basis and then sell the assembled mortgages back to CC Mortgage or its designee at a specified premium (the "KPMCC Repo Transaction No. 2").

As with KPMCC Repo Transaction No. 1, TBC entered into a custodial agreement with the seller and purchaser of the mortgages that similarly required TBC to take assignment of mortgages governed by the KPMCC Repo Transaction No. 2 as an agent and bailee and custodian of KPMCC, including for the purpose of perfecting a security interest for KPMCC (the "Second Custodial Agreement"). TBC also took custody of the certain mortgage documents, not including the TILA disclosure and HUD–1 statements, at its Houston headquarters. The Barry mortgage then remained with TBC under the Second Custodial Agreement.

In July, 1994 KPMCC sold back to CC Mortgage certain mortgages, including the Barry mortgage. On the same day, CC Mortgage sold these mortgages to Fund America Investors Corporation II ("Fund America") which, on the same day, sold them to a trust, the trustee of which was State

Street Bank and Trust Co. ("State Street"). The trust offered for purchase securities backed by the mortgages it had acquired. TBC entered into a new custodial agreement with CC Mortgage, State Street and National, under which it again took assignment as agent and bailee of State Street from Fund America and retained custody of the mortgage documents at its Houston headquarters (the "Fund America Custodial Agreement").

Barry claims that the assignments to TBC under the custodial agreements subject the bank to liability for the alleged misrepresentations in the TILA disclosure statements. TBC has moved to dismiss these claims on the grounds that this Court lacks *in personam* jurisdiction over it (Fed.R.Civ.P. 12(b)(2)) and alternatively, that Barry has failed to state claims upon which relief can be granted (Fed.R.Civ.P. 12(b)(6)).

*Discussion*

### I. Fed.R.Civ.P. 12(b)(2) Standards and Methods of Adjudication

Generally, due process dictates that in order for a party, absent from the territory of the forum, to be subject to the forum court's *in personam* jurisdiction, he must have certain minimum contacts with the forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940), *reh'g denied*, 312 U.S. 712, 61 S.Ct. 548, 85 L.Ed. 1143 (1941)). The United States Court of Appeals for the First Circuit has delineated three standards by which courts may determine motions to dismiss for lack of *in personam* jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). *Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, 675–77 (1st Cir.1992). Under each of these standards, "the plaintiff has the burden of showing that jurisdiction exists," regardless of the nature of the proceedings or the form of the proffers. *Id.* (quoting *Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 979 (1st Cir.1986)).

The *prima facie* standard permits the court "to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Boit*, 967 F.2d at 675. To make this showing, the plaintiff cannot simply rest upon the pleadings but must make affirmative proof of specific facts supportive of the court's jurisdiction. *Id.* In employing this analysis, the court acts not as a factfinder, but instead, as it would in the summary judgment context. *Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir.1995). Thus, the court must accept plaintiff's (properly documented) evidentiary proffers as true in determining the adequacy of the *prima facie* jurisdictional showing. *Id.* A denial of a defendant's motion to dismiss for lack of personal jurisdiction based on the *prima facie* standard is in effect a reservation of the ultimate determination of the jurisdictional issue until trial. *Boit*, 967 F.2d at 676.

In the alternative, the court may employ a preponderance of the evidence standard when it

> determines that in the circumstances of a particular case it is unfair to force an out-of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more of the plaintiff than a *prima facie* showing of facts essential to *in personam* jurisdiction. A court may so determine, for example, when the proffered evidence is conflicting and the record is rife with contradiction or when a plaintiff's affidavits are "patently incredible" . . .

*Id.* In doing so, the court "hears and determines the motion to dismiss before trial," Fed.R.Civ.P. 12(d), considers all relevant evidence submitted by the parties and makes all factual findings necessary to disposition of the motion. *Id.* This method must be used with care however, for if a court makes pretrial findings by a preponderance of the evidence standard, troubling issues may arise as to whether "issue preclusion" or "law of the case" will later preclude a party from asserting facts contrary to what was previously found by the court. *Id.* at 677.

In some cases, where the assertion of jurisdiction contains issues of fact common to

the merits of the case, the possibility of preclusion renders use of the preponderance of the evidence standard impracticable, while the possibility of permitting a case based on dubious personal jurisdiction to proceed past the pleadings stage makes the use of the *prima facie* standard unreasonable. *Foster–Miller,* 46 F.3d at 146. Under these circumstances, a court may utilize an intermediate standard whereby it allows an evidentiary hearing but only determines whether "the plaintiff has shown a likelihood of the existence of each fact necessary to support personal jurisdiction." *Boit,* 967 F.2d at 677.

When a court uses this third method, as when it uses the first method and denies a motion to dismiss because the plaintiff fails to make a *prima facie* showing, a denial of the motion to dismiss is an implicit deferral until trial of the final ruling on jurisdiction. Unlike the first and like the second method, the third method involves factfinding rather than merely making a ruling of law regarding the sufficiency of the evidence to present a fact question. Like the first and unlike the second method, however, the third method avoids potentially troubling issues of "issue preclusion" or "law of the case" (at least when the court denies the motion) because a determination by such an intermediate standard— like a determination on a "likelihood of success" standard applied to a motion for preliminary injunction ... does not purport to be a finding by the same standard on the same issue as will be decided at trial.

*Id.* at 678. Going a step further, when the court grants a motion to dismiss under this intermediate standard, thereby determining that the plaintiff has not shown the likelihood of the existence of each fact necessary to personal jurisdiction, its findings are also not binding through the "law of the case" or "issue preclusion" doctrines, just as findings within denials of motions for preliminary injunction based on the "likelihood of success" standard are not binding. *Cf. Meineke Discount Muffler v. Jaynes,* 999 F.2d 120, 123 n. 3 (5th Cir.1993) (ruling that denial of request for preliminary injunction is not binding as the "law of the case"); *Berrigan v. Sigler,* 499 F.2d 514, 518 (D.C.Cir.1974) ("The decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits...."); *Travelers Ins. Co. v. Westridge Mall Co.,* 826 F.Supp. 289, 293 n. 2 (D.Minn.1992) (same), *aff'd,* 994 F.2d 460 (8th Cir.1993); *Consumers Union of U.S., Inc. v. New Regina Corp.,* 664 F.Supp. 753, 760 (S.D.N.Y.1987) (holding that rulings that deny preliminary relief for want of a clear and strong showing on the merits do not trigger "law of the case" consequences); *Walt Disney Productions v. Filmation,* 628 F.Supp. 871, 879 (C.D.Cal.1986) (stating that appraisal of the "likelihood of success" standard is not a final decision on the merits). The First Circuit has recognized the possibility of dismissal under the intermediate standard but has cautioned that such dismissals will be rare. *Foster–Miller,* 46 F.3d at 148.

■ In this case, use of the intermediate standard is warranted. The parties' initial submissions raised more questions regarding personal jurisdiction over TBC than they answered. Thus, more detailed proffers of evidence and findings thereon were needed. In the context of TBC's 12(b)(2) motion, the parties were debating the extent to which the assignments of mortgages to TBC as custodian and trustee amounted to an actual assignment of full ownership rights in the mortgages. This issue is also relevant to TBC's potential liability under the Truth in Lending Act as an assignee. *See* 15 U.S.C. § 1641(a). Wishing to avoid the potential troubling consequences of making findings under the preponderance of the evidence standard, I opted for the less burdensome intermediate standard. In doing so, I took heed of First Circuit warnings regarding the use of this method and provided the parties with notice of my selection of the intermediate standard on April 4, 1995 and allowed them to make further submissions through May 15, 1995.

It is worth noting that Barry complains in his January 30, 1995 initial response in opposition to TBC's motion to dismiss that disposition of the motion should be deferred until more discovery could be completed. Specifically, he complains of certain discovery re-

quests propounded to TBC that in his opinion, were answered incompletely or were inappropriately objected to. The First Circuit has cautioned that when the court employs the preponderance of the evidence or intermediate standards, parties should be provided with reasonable access to discovery, *Foster–Miller,* 46 F.3d at 148, and requests to defer ruling on 12(b)(2) motions to dismiss pending further discovery should be honored, *Boit,* 967 F.2d at 680–81. However, as the following procedural chronology indicates, Barry had ample time to pursue what he considered incomplete discovery responses by TBC and did not.

TBC's motion to dismiss was filed November 28, 1994, and according to Barry, he did not receive the discovery responses in question until January 27, 1995. He thereafter filed his opposition to the motion to dismiss on January 30, 1995 which requested a ruling on the motion be deferred pending completion of discovery. On February 22, 1995, TBC file a reply memorandum arguing, *inter alia,* against the need to defer disposition of the motion to allow for further discovery. The motion to dismiss was then referred to me on February 28, 1995. Oral argument was heard on the motion on April 4, 1995, and the next day I issued an order notifying the parties of my intention to employ the intermediate standard and allowing them to and including April 28, 1995 to submit further evidence regarding the Court's personal jurisdiction over TBC. Barry submitted further evidence purporting to show TBC's status as a full assignee of the mortgages in question. Thereafter, upon TBC's request, I granted the parties to and including May 15, 1995 to submit further evidence related to Barry's latest submissions.

■ A review of the docket in this case reveals that despite the extended period from Barry's initial complaint, regarding TBC's alleged incomplete discovery responses, on January 30, 1995, to the final date for submissions on May 15, 1995, Barry made no additional efforts to compel TBC to respond more fully to the discovery requests in question. Barry filed no motions to compel TBC's responses to these requests in the more than three months between his initial objection and the May 15 cut-off date and therefore, cannot be heard now to complain that he did not have the proper information at his disposal to oppose TBC's motion to dismiss. It is the plaintiff's burden to demonstrate the existence of personal jurisdiction over TBC, *Boit,* 967 F.2d at 674–74, and that burden extends to require the plaintiff, not the court, to take reasonable measures to garner the evidence he needs to carry this burden. Consequently, at this stage, Barry's arguments will be judged based on the evidence he has sought and provided to the Court, and the motion will be decided on the record as it currently stands.

As one last preliminary issue, Barry objects to the Court's consideration of the Affidavit of Susan Needham ("Needham"), a Vice President and Trust Officer of TBC, on the grounds that it does not comply with Fed. R.Civ.P. 56(e)'s requirements that it be based on personal knowledge and that sworn or certified copies of all papers referred to therein be attached thereto. Needham does state in the affidavit that she is familiar with the matters presented therein based on personal knowledge or her examination of TBC files. (Needham Aff. ¶ 2.)

First, this motion is not made pursuant to Rule 56 and therefore, subpart (e) of that rule does not apply to this 12(b)(2) motion. Second, TBC attaches the three custodial agreements that define its duties as an assignee as custodian and trustee under those agreements to the Needham Affidavit. Attachment of the KPMCC Repo Transactions Nos. 1 and 2 and the Fund America Transaction agreement referred to in the affidavit would be superfluous, as those documents have not been argued to be at all relevant to the issues before the Court. Third, this Court has historically accepted affidavits in which the affiant testified to facts found in various documents based on his or her review of those documents. The bulk of the relevant testimony in Needham's affidavit relates to TBC's status as an assignee as a custodian and trustee under the custodial agreements and tracks language found in those agreements. Thus, there is little harm in relying on these assertions. Lastly, as is discussed *infra,* for purposes of the 12(b)(2)

motion, I have assumed that Barry's contention that TBC is an assignee with full ownership rights is correct. Therefore, any assertions by Needham regarding these assignments to the contrary have not been considered in this opinion.

## II. Personal Jurisdiction

■■■ The defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) should be granted, as this Court does not have *in personam* jurisdiction over TBC. Where a federal court has subject matter jurisdiction over an action pursuant to a federal statute, it may exert personal jurisdiction over the defendant in one of two ways: pursuant to an express authorization for nationwide service in the federal statute, or pursuant to the long arm statute of the state in which the court sits. *See United Elec. Workers v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1085–86 (1st Cir.1992). If the federal statute does not provide for nationwide service, then, personal jurisdiction is governed by the forum state's long arm statute. *See Lorelei Corp. v. County of Guadalupe*, 940 F.2d 717, 720 (1st Cir. 1991). TILA, 15 U.S.C. § 1601 et seq., the federal statute sued upon in the present case does not provide for nationwide service of process. *Bernard v. Richter's Jewelry Co.*, 53 F.R.D. 606, 607–8 (S.D.N.Y.1971). Thus, my attention turns to the Rhode Island long-arm statute, R.I.Gen.Laws § 9–5–33,[1] which authorizes personal jurisdiction to the fullest extent permitted by the United States constitution. *Almeida v. Radovsky*, 506 A.2d 1373, 1374 (R.I.1986). As a result, I need only determine whether personal jurisdiction over TBC comports with the strictures of the due process clause of the Fourteenth Amendment to the United States Constitution. *Levinger v. Matthew Stuart and Co., Inc.*, 676 F.Supp. 437, 439 (D.R.I.1989).

Due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*International Shoe Co. v. Washington*, 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. at 463, 61 S.Ct. at 343).

The application of [the minimum contacts] rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*United Elec. Workers v. 163 Pleasant Street Corp.*, 960 F.2d at 1088 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, *reh'g denied*, 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92 (1958)).

This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State.

*Burger King v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1984) (citations omitted). Further, "a defendant's 'conduct and connection with the forum State [must] [be] such that he should reasonably anticipate being haled into court there.'" *Id.* at 474, 105 S.Ct. at 2183 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)).

■■■ In analyzing the minimum contacts rule, courts have recognized two types of jurisdiction: specific and general. Specific *in personam* jurisdiction is said to exist if the suit arises out of or relates to the defendant's contacts with the forum state. *Glater v. Eli*

1. The Rhode Island long arm statute provides: Every foreign corporation, every individual not a resident of this state ... and every partnership or association, composed of any person or persons, not such residents, that shall have the necessary minimum contacts with the state of Rhode Island, shall be subject to the jurisdiction of the state of Rhode Island ... in every case not contrary to the provisions of the constitution or laws of the United States. R.I.Gen. Laws § 9–5–33.

*Lilly & Co.,* 744 F.2d 213, 215 (1st Cir.1984). If so, then specific *in personam* jurisdiction may be found based on the relationship among the defendant, the forum, and the litigation. *Id.* General *in personam* jurisdiction is said to exist where a defendant has such continuous and systematic contacts with the forum that bringing him into court on any matter, whether arising out of those contacts or not, does not offend the *International Shoe* due process standard. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 9, 104 S.Ct. 1868, 1872 n. 9, 80 L.Ed.2d 404 (1984); *Glater v. Eli Lilly & Co.,* 744 F.2d at 216.

### A. Specific Jurisdiction

■ The exercise of specific *in personam* jurisdiction is inappropriate "whenever the connection between the cause of action and the defendant's forum-state contacts seems attenuated and indirect. Instead, the defendant's in-state conduct must form an 'important, or [at least] material, element of proof' in the plaintiff's case." *United Elec. Workers v. 163 Pleasant Street Corp.,* 960 F.2d at 1089.

■ Mindful of these cautions, the United States Court of Appeals for the First Circuit has enunciated a tripartite test to determine whether specific *in personam* jurisdiction exists:

1. The claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities.
2. The defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's law and making the defendant's involuntary presence before the state's courts foreseeable.
3. The exercise of jurisdiction must be reasonable.

*Id.* It is the named class representative, Barry, whose claims must satisfy this test in order for the Court to have personal jurisdiction over TBC in this action. *See Calagaz v. Calhoon,* 309 F.2d 248, 253 (5th Cir.1962); *Selman v. Harvard Medical School,* 494

F.Supp. 603, 613 n. 6 (S.D.N.Y.), *aff'd,* 636 F.2d 1204 (2nd Cir.1980); *Local 15 of Ind. Workers v. International Bro. of Elec. Workers,* 273 F.Supp. 313, 317 (N.D.Ind.1967). *Cf. Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1169 (3rd Cir.1987) (holding dismissal of case prior to class certification was appropriate where named class representative did not have viable cause of action).

Barry argues that "[TBC] has 'purposefully directed' efforts toward Rhode Island by acquiring interests in numerous notes and mortgages that were executed in Rhode Island and/or are secured by Rhode Island property" and is thus subject to personal jurisdiction in this forum. (Pl.'s Response to TBC's Mot. to Dismiss ("Pl.'s Resp.") at 9.) He cites a number of cases for the proposition that "[i]t is constitutionally permissible to subject an out-of-state business to jurisdiction based on its ownership of an interest in real estate within the jurisdiction." (Pl.'s Resp. at 9 (citing, *inter alia, Zartolas v. Nisenfeld,* 184 Conn. 471, 440 A.2d 179, 180–81 (1981); *Crestmont Fed. S & L Ass'n v. Clock Tower Vista Assoc.,* 1991 WL 112355 *2, 1991 Conn.Super. LEXIS 1386, at *5 (Conn.Super.1991); *Newman v. 1st 1440 Investment, Inc.,* 1990 WL 125369 *3, 1990 U.S.Dist. LEXIS 10989, at *7–*8 (N.D.Ill. 1990)).

In *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1976), the United States Supreme Court held that the minimum contacts standard elucidated in *International Shoe* governed the exercise of jurisdiction over a non-resident defendant based on his or her ownership of property or an interest in property located in the forum. *Id.* at 207, 97 S.Ct. at 2581. That is not to say that the existence of the property in the forum may not in some circumstances provide the necessary contacts between the forum, the defendant and the litigation. *Id.* When claims to the property itself are the source of the underlying dispute between the parties, the forum in which the property is located would most likely have jurisdiction. *Id.* However, where the property is completely unrelated to the plaintiff's cause of action, the presence of the defendant's prop-

erty in the forum will not alone support the exercise of jurisdiction. *Id.*

In the present case, the parties hotly dispute whether TBC owns an interest in the mortgage secured by Barry's real property and the note therewith which gives rise to his claims. Assuming, without deciding, for purposes of this point that TBC owns such an interest, Barry's property, securing the mortgage that his claims arise from, is not located in this forum, Rhode Island, but instead is located in Massachusetts. (Amended Complaint ¶ 17.) Thus, any ownership interest that TBC may arguably have in this property is not a contact with Rhode Island and therefore cannot provide the basis for specific *in personam* jurisdiction over TBC in this forum. Moreover, ignoring the facts that Barry is a Massachusetts resident and his loan closed in that state, whether or not the loan originated in Rhode Island is irrelevant, as the unilateral activity of parties other than the non-resident defendant cannot satisfy the requirement of the defendant's contact with the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. at 474, 475, 105 S.Ct. at 2183, 2184. Here, there is no evidence to suggest that TBC had anything to do with the origination of this loan. Thus, B First's origination of the loan in Rhode Island is irrelevant to TBC's contacts with the state. Consequently, there is no basis for the exercise of specific *in personam* jurisdiction over TBC.

### B. General jurisdiction

The general jurisdiction standard, requiring continuous and systematic contacts, is considerably more stringent than the standard for specific jurisdiction which is satisfied upon a showing of minimal contacts alone. *Donatelli v. National Hockey League,* 893 F.2d 459, 463 (1st Cir.1990). TBC points to its dearth of direct contact with Rhode Island, stating that TBC: (1) is neither chartered nor authorized to conduct banking operations in Rhode Island; (2) does not have any branch, office, real property or telephone listing in Rhode Island nor any banking personnel that are based in or travel regularly to Rhode Island; (3) does not advertise in Rhode Island; and (4) does not enter into contracts in Rhode Island. (Needham Aff. ¶¶ 41–44.) Barry instead focuses on TBC's interaction with Rhode Island customers and on its role in the secondary mortgage market. He points out that TBC currently: (1) has outstanding loans to twenty four customers with addresses in the State of Rhode Island, totaling $134,035; (2) holds deposits from twenty six customers in the State of Rhode Island, totaling $514,727; and (3) manages nine brokerage accounts for persons or entities with addresses in Rhode Island. (TBC's Responses to Interrogs. Nos. 1, 5, 6.) However, these contacts are irrelevant to the discussion of personal jurisdiction because "it is contact with the state, and not its residents, that is pertinent." *Russo v. Sea World of Florida, Inc.,* 709 F.Supp. 39, 42 (D.R.I.1989) (citing *Helicopteros,* 466 U.S. at 417, 104 S.Ct. at 1873). As noted above, TBC has no branches and does not solicit banking business in Rhode Island, therefore these loans, deposits and brokerage accounts are irrelevant contacts with residents of Rhode Island and not the state itself.

Barry next argues that TBC's status as assignee of 138 mortgages secured by real property located in Rhode Island provides sufficient contacts with Rhode Island for this court to exercise general personal jurisdiction over TBC. Barry contends that TBC "has ownership interests [in] or title to" the mortgages. (Pls.' Submission of Further Evidence at 2.) In support of this contention, he points to the recorded assignment of his own mortgage to TBC as "custodian or trustee" (Amended Complaint, Ex. D). TBC counters that this assignment, as part of the original repo transaction between KPMCC and B First, served only to make TBC a custodian or bailee of the mortgages in question and provided TBC with no right of ownership whatsoever. However, this dispute need not be resolved for purposes of this Rule 12(b)(2) motion, because as noted above, the court in *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1976), held that the *International Shoe* minimum contacts standard governs the exercise of jurisdiction over a person based on his or her ownership of property in the forum. *Id.* at 207, 97 S.Ct. at 2581. Where the property is completely unrelated to the plaintiff's cause

of action, the presence of the defendant's property in the forum will not alone support the exercise of jurisdiction. *Id.* Such is the case here where the 138 mortgages secured by Rhode Island property are unrelated to Barry's claims which are the only ones properly considered by the Court for purposes of this jurisdictional analysis, as he is the named class representative. *See* cases cited *supra* at 73. Assuming without deciding that TBC did receive some ownership rights in the mortgages secured by Rhode Island property, TBC's contacts with the State of Rhode Island based on its purported interest in those mortgages must still be judged under the *International Shoe* minimum contacts standard, *Shaffer v. Heitner,* 433 U.S. at 207, 97 S.Ct. at 2581, requiring continuous and systematic contacts in the general jurisdiction context. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. at 414 n. 9, 104 S.Ct. at 1872 n. 9; *Glater v. Eli Lilly & Co.,* 744 F.2d at 216.

Barry points to motions and supporting memoranda filed in two cases pending in the United States Bankruptcy Court for the District of Rhode Island as evidence of TBC's contacts with Rhode Island. Those motions denominate TBC as "custodian or trustee, assignee of B First Residential Corporation . . ., secured creditor" and seek relief from the Bankruptcy Code's automatic stay existing pursuant to 11 U.S.C. § 362 in order to permit TBC to exercise the power of sale contained in two mortgages secured by Rhode Island property. (Pls.' Submission of Further Evidence, Exs. A, C.) These two acts by no means amount to "continuous and systematic" contacts with Rhode Island such that jurisdiction can be properly exercised by this Court over TBC. Case law defining "continuous and systematic" in the context of interstate sales and in relation to a defendant's total sales is instructive here.

The "continuous and systematic" requirement has been characterized as being satisfied when the defendant's forum contacts are "extensive and pervasive." *Romann v. Geissenberger Mfg. Corp.,* 865 F.Supp. 255, 260 (E.D.Pa.1994). "These contacts must be 'so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely distinct from those activities.'" *Charlesworth v. Marco Mfg. Co.,* 878 F.Supp. 1196, 1201 (N.D.Ind.1995) (quoting *International Shoe,* 326 U.S. at 318, 66 S.Ct. at 159). In *Charlesworth v. Marco Mfg. Co.,* 878 F.Supp. 1196, the defendant had no facilities, employees, phone listing or bank account in the forum. *Id.* at 1201. It was not registered to do business and did not advertise there. Its only contacts with the forum were that a former sales agent lived there and 0.28%–0.36% of its annual sales occurred there through independent distributors. *Id.* The court stated that "the law is clear that such sales give rise to general personal jurisdiction only where the amount of sales is 'significant'" and concluded that the defendant's in-forum sales and contacts were not significant such that personal jurisdiction over the defendant existed. *Id.* 1201–02.

Likewise, other courts have held that no general *in personam* jurisdiction exists were the defendant's in-forum sales are low and there is no direct solicitation in the forum. *See Romann v. Geissenberger Mfg. Corp.,* 865 F.Supp. at 261 (finding no "continuous and systematic" contacts where only two to four percent of the defendant's annual sales were in the forum and defendant did not advertise or promote its product there); *Modern Mailers, Inc. v. Johnson & Quin, Inc.,* 844 F.Supp. 1048, 1054 (E.D.Pa.1994) (finding no "continuous and systematic" contacts where only 0.5% of defendant's total sales were in the forum and defendant's salespersons did not regularly solicit business there, and citing other similar cases). These cases can be analogized to the present one and compel a similar conclusion.

During the relevant period, the 138 Rhode Island mortgages that TBC took assignment of as custodian or trustee in mortgage repurchase or securities transactions represented less than .33% of its overall mortgage repurchase and securities business. (TBC's Responses to Interrogs. No. 2.) In addition, there is no indication that TBC solicited the assignment of these mortgages in Rhode Island, as none of the custodial agreements were negotiated or executed in Rhode Island. (Needham Aff. ¶¶ 20, 25, 33.) Moreover, the

two Rhode Island contacts that Barry points to, the bankruptcy motions, were not of a substantial nature. There is evidence in the record that National, not TBC initiated and controlled the bankruptcy motions at issue. Attorneys from the local law firm handling these matters submitted affidavits stating: that they had been retained and paid by National for the purpose of commencing the foreclosure proceedings at issue in the bankruptcy motions; that National had requested the mortgages be foreclosed in the name of TBC; and that they had no communications with TBC with regard to the foreclosures. (Lovell Aff. ¶¶ 3, 6, 7; Antonelli Aff. ¶¶ 3, 6, 7.) TBC additionally states that no one at its Houston, Texas headquarters knew of the foreclosures. (Supp. Needham Aff. ¶ 10.) Further, TBC would not receive nor retain the proceeds of any foreclosure proceedings; rather, they would be sent directly to National who would forward them, minus fees, to the mortgage owner. *Id.* ¶ 11. Clearly then, in the scheme of TBC's extensive mortgage repurchase and securities business, these two bankruptcy proceedings are not "significant" or "extensive or pervasive" such that they may be considered "continuous and systematic" contacts with the State of Rhode Island. Moreover, the attenuated nature of TBC's contact to the bankruptcy proceedings is not an example of purposeful contact by TBC that "creates a 'substantial connection with the forum State." *Burger King v. Rudzewicz,* 471 U.S. at 475, 105 S.Ct. at 2184. These facts may ultimately go a long way towards showing that TBC has interests in these mortgages more significant than simply that of a custodian or bailee, but they do not on their own establish the minimum contacts required for the exercise of general *in personam* jurisdiction over TBC in this forum. Consequently, the plaintiff has failed to show a likelihood of the existence of facts necessary to support personal jurisdiction under the *Boit* intermediate standard. As a result, TBC's motion to dismiss for lack of *in personam* jurisdiction should be granted.

### Conclusion

For the reasons stated, I recommend defendant's motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(2) be granted, and the defendant's motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) be denied without prejudice as moot.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir. 1980).

July 14, 1995.